1  Hadar W, Weitzman State Bar No. 152935
2  Hadar Weitzman Law Corp.
   5 Coronet Way
3  Kentfield, CA 94904
   Telephone: 415-747-8995
4  Cell phone: 415-306-3150
   Facsimile: 415-789-4000
5  E-mail Address: hweitzman2010@gmail.com

6  Attorney for Plaintiffs

7                **UNITED STATES DISTRICT COURT**

8              **NORTHERN DISTRICT OF CALIFORNIA**

9                     **SAN FRANCISCO**

10

11  LOCKSMITH EMERGENCY SOLUTIONS        )   Case No. _____
    INC.; MORDECHAY (MARK) AMAR.         )
12                                       )   **VERIFIED COMPLAINT**
              Plaintiff,                 )   **FOR:**
13                                       )
                                         )
14        v.                             )
                                         )   1. **Breach of Contract**
15  _____ Defendants.     )   2. **Fraud**
    MENAHEM SHALIT (Aka MANOR            )   3. **Unjust Enrichment**
16  SHALIT)                              )   4. **Negligence**
    YOSEF WEINTRAUB                      )   5. **Breach of Implied Covenant of Good**
17  SHACHAR BARBIE (Aka DAWN BARBIE;     )      **Faith and Fair Dealing**
    Aka SHOSH BARBIE)                    )   6. **False Promise**
18  AHARON WEINTRAUB                         7. **Intentional Infliction of Emotional**
19  DAWN & THE LOCK INC                         **Distress**
    JOE & THE LOCK, INC.                     8. **Trademark Infringement, and**
20  KING KEY LOCKSMITH SAN                      **Unfair Competition**
    FRANCISCO, INC.                          9. **Inducing Breach of Contract.**
21  LOCKSTAR LOCKSMITH SAN
22  FRANCISCO, INC.,
    DOES 1-10                                **JUDGE:**
23                                           **DEPT:**
24

25  _____

26

27

28

1

2  Plaintiff LOCKSMITH EMERGENCY SOLUTIONS  Inc. a California Corporation, and

3  Plaintiff Mordechay Amar, (Hereinafter, either or both,  "Amar" "Plaintiff" or "Plaintiffs")

4  allege causes of action against MENAHEM SHALIT (AKA MANOR SHALIT), YOSEF

5  WEINTRAUB, SHACHAR BARBIE (Aka DAWN BARBIE; Aka SHOSH BARBIE) ,

6  AHARON WEINTRAUB, DAWN & THE LOCK INC., JOE & THE LOCK, INC., KING KEY

7  LOCKSMITH SAN FRANCISCO, INC., LOCKSTAR LOCKSMITH SAN FRANCISCO, INC.

8  and Defendants DOES 1-10 as follows:

9      ///

10  This Complaint is VERIFIED according to California Code of Civil Procedure Section 446. The

11  Verification is at the end of the Complaint after the signature.

12              **THE PARTIES JURISDICTION AND VENUE**

13  1.  Plaintiff LOCKSMITH EMERGENCY SOLUTIONS INC., a California Corporation,

14      ("**Plaintiff 1**" or "**LES**"") is now, and at all relevant times mentioned in this complaint,

15      was a corporation with its address in Santa Clara County, and doing business in the San

16      Francisco Bay Area, including San Francisco County, Santa Clara County, and other

17      counties in the Bay Area.

18  2.  Plaintiff Mordechay Amar is an individual and resides in Santa Clara County (**"Plaintiff**

19      **2"** or "**Amar**"). Both Plaintiffs are referred to as "**Plaintiff**" or "**Plaintiffs**". That is,

20      Plaintiffs may be referred to as "Plaintiff" in single language as well, even when referring

21      to all of them.

22  Defendants 1-4:

23      ➢  Mr. Menahem Shalit (AKA Manor Shalit) ("**Defendant 1**" or "**Manor**" or

24          "**Shalit**"), is an individual, citizen of Israel. On information and belief Manor's

25          lives in California in recent years. The address he provided to the Secretary of State

26          when he registered a company in California in January 2019 was in San Francisco.

27

28

➤ Mr. Yosef Weintraub (**"Defendant 2" or "Yosef" or "Weintraub the Husband"**), is an individual. On information and belief Yosef has dual citizenship of Israel and the U.S.

➤ Ms. Shachar Barbie (AKA Dawn Barbie; AKA Shosh Barbie) **(Defendant 3" , "Shachar", "Dawn", "Barbie" or "The Girlfriend") ,** is an individual citizen of Israel. On information and belief in the relevant period resides in the San Francisco Bay Area. And,

➤ Mr. Aharon Weintraub (**"Defendant 4" or "Aharon" or "Weintraub the Brother")** is an individual. On information and belief Aharon has dual citizenship Israel and the U.S. The address Aharon provided to the Secretary of State when he registered a company in California in January 2019 was in San Francisco

Each of the above defendants is a competent adult. Each defendant named above (Defendants 1-4) is a natural person.

<u>Defendants 5 - 8</u>

Defendants 5-8 are California corporations. According to California Secretary of State, each of these corporations is registered under the directorship of one of the above individuals:

➤ DAWN & THE LOCK INC. ("**Defendant 5**" or "**DTL**") is a California Corporation. The CEO, secretary, CFO, Director, and Agent for Service of process is: SHACHAR BARBIE 3 PLAZA VIEW LN APT 320, FOSTER CITY, CA 94404 (also known as "Defendant 3" or "Shachar" as described above**).**

➤ JOE & THE LOCK, INC. is a California Corporation **("Defendant 6" or JTL").** Yosef Weintraub (referred to above as "Defendant 2" or Yosef) is registered as the company's CEO, CFO, Secretary and Director. Company Agent for Service of Process is YOSEF WEINTRAUB 2100 GENG RD SUITE 210 PALO ALTO CA 94303.

➤ KING KEY LOCKSMITH SAN FRANCISCO, INC. is a California Corporation **("Defendant 7" or "KING KEY").** Menahem Shalit (Aka Manor Shalit), and he

is referred to above as "Defendant 1" or "Manor"), is registered as the company's President and Director, Company Agent for Service of Process is Menahem Shalit 1050 Post St. Ste. 44, San Francisco, CA. 94109**.**

➢ LOCKSTAR LOCKSMITH SAN FRANCISCO Inc. Is a California Corporation **("Defendant 8" or "LOCKSTAR")**, Aharon Weintraub (Referred to above as "Defendant 4" or "Aharon") is registered as the company's CEO, CFO, Secretary and Owner. Company's principal office is at 2404 27TH AVE, SAN FRANCISCO, CA 94116. The updated Company Agent for Service of Process is AHARON WEINTRAUB 2404 27TH AVE SAN FRANCISCO CA 94116.

(All eight defendants, in this document, are referred to as "**Defendants**" or **Defendant**"). (In this document Defendants may be referred to as "Defendant" as well, in single language even when referring to all of them).

3. Plaintiff does not know the true names of defendants DOES 1 through 10, and therefore sues them by those fictitious names. Plaintiff is informed and believes, and on the basis of that information and belief alleges, that each of those Defendants were in some manner legally responsible for the events and happenings alleged in this complaint and for Plaintiff's damages. The names, capacities and relationships of DOES 1 through 10 will be alleged by amendment to this complaint when they are known.

4. Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned each Defendant was the agent or employee of each and every other Defendant and, in doing the things alleged herein, was acting in the course and scope of its/his/her agency and/or employment and was acting with the consent, permission, and authorization of each and every remaining Defendant. The acts and conduct of each Defendant herein were ratified and approved by every remaining Defendant.

5. Further, for this reason, sometimes in this Complaint when referring to the name "**Manor**" it means all other defendants who were working or acting on his behalf, registering companies on his behalf, acting as his long arm, acting as his cover to hide his true interest and control, and or acting as his agent.

6.      This court is the proper court and venue in this District is proper pursuant to 28 U.S.C. § 1391(b) because Defendants 7-8 reside in this District, because of diversity while there is more than $75,000 in dispute, and because the case considers Federal Law. In addition: 1) At least one defendant resides in this County; 2) the contract was to be performed in San Francisco County, California; 3) The contract was breached in Francisco County California.

////

////

## FACTS COMMON TO ALL CAUSES OF ACTION

7.  On or about the 4th quarter of 2017 Plaintiffs,   LOCKSMITH EMERGENCY SOLUTIONS   INC. and MORDECHAY (MARK) AMAR (Hereinafter "**Amar**" or "**Plaintiffs**"), entered into an oral agreement (Hereinafter "**The Agreement**") with Manor (also referred to as Defendant 1), Defendant 2 and Defendant 3. Defendants breached the agreement in many ways, they also breached the duty of trade secrets, and other duties. It was agreed, among other things, the following points:

8.  Amar and Manor agreed to establish a partnership in the business of automotive locksmith. This is in parallel and in addition to Amar's maturely established automotive locksmith business, but it was agreed that Manor will not open any business of automotive locksmith in two specific geographical areas of service, and there were other arrangements as described below.

9.  The new business was to be managed by Manor but will receive from Amar the following: Knowledge, know-how, trade secrets, connections, some assistance in financing the working capital. And, in addition, Amar contributed to Manor in providing Amar's reputation and his authority and former relationship with a third party (namely, Nir Philo) in order to assist Manor solve his problems and Manor's unsuccessful relationship with the people in the industry whom Manor stole a business from, and stole referral companies from. Amar agreed to be Manor's back.

10. This assistance was very important for Manor and Amar provided that assistance as well. Without that assistance, Manor could not work in the San Francisco Bay Area at all, and even not stay in this area.

11. Part of this assistance is by Amar giving his name to the business (and not just his know how, and financing, so that when third parties know Amar is part of it, Manor is able to run the business and he can have more achievements in many fields.

12. Previously to that, Manor was not an automotive locksmith. He was only a regular locksmith. Amar trained him to be an automotive locksmith for the purpose of the partnership.

13. It was agreed that the new partnership business will be registered as two different corporations, one on the name of Defendant 2, (Mr. Yosef Weintraub), and one on the name of Defendant 3 (Ms. Shachar Barbie AKA Dawn Barbie). ("Joe & the Lock", Defendant 5, and "Dawn and the Lock, Defendant 6, Respectively).

14. The reason for registering these two corporations on people trusted by Manor, as Manor requested, was that Manor "had no papers" in the US, and because he had to hide his activity from other locksmith people whom he had betrayed, and also for reasons of Google restrictions regarding advertisements in the industry.

15. Manor told Amar that these are people close to him because Yosef (Defendant 2) is his officially registered husband, and close friend since their army service together in Israel, and that although the marriage between Manor and Yosef is for the purpose of a Green Card only, they are flat mates and Manor trusts Yosef. This way, the company Defendant 6, Joe & THE LOCK INC, was registered on Yosef.  Manor also told Amar that he trusts Ms. Shachar Barbie because she is his girlfriend, and they are in a serious relationship, planning to get married in the future. Therefore, the other company, Defendant 5, DAWN & THE LOCK INC, was registered on her.

16. As agreed, Manor is managing these businesses and Amar assists as described, and although Manor and Amar are partners, the companies and the locksmith license are

officially registered under the names of the other two persons (Yosef, and Shachar Barbie, aka Dawn aka Shosh).

17. That is except in the case of Yosef (Defendant 2). Manor told Amar that Yosef is receiving some ownership of that business, out of Manor's share, in return for Yosef agreeing to help Manor get a Green Card by the process of marriage.

18. As mentioned, Amar provided Manor and the new businesses the specific knowledge and trade secrets of the automotive locksmith industry (which is distinguished and more sophisticated than a regular locksmith for houses or doors).

19. Amar will also supply, and he did, specific assistance with working capital as a loan. As part of this, Amar provided Manor with a 2016 Mercedes Benz Van Metris. The van was fully modified for the purpose of automotive locksmithing, fully equipped for automotive locksmith work, and included all the tools required for an automotive locksmith. The Mercedes Van was fully ready for automotive locksmith work, which includes the knowledge, know how, etc. It was modified accordingly for that purpose by Amar. The car with the modifications and tools was transferred as a loan, in order to assist the new businesses. Obviously, this is a very expensive vehicle and it was only about 2 years old. The modification alone cost in the range of $10,000, the car is estimated to be worth at the time approximately $29,000 and the tools about $15,000. The total for that is estimated at approximately $54,000. Obviously, Manor (and the other defendants who are his long arm and acting as a cover) could not finance such an amount and could not have the means to open the business without Amar's help. However, that was part of the consideration Amar provided, and Amar expected in return the Defendants to perform as well.

20. It's important to note that no one in this industry would give a car like this, with it's equipment and tools, and in such high valuation, including the know-how, and trade secrets unless they have an interest in the new business, and unless there are promises by the partner to avoid direct competition. Definitely it is obvious that no one would give such a vehicle with the training and know-how, and trade secrets, unless there is a promise in

return from the partners to not compete in a specific small area, which is considered a direct competition.

21. In addition, Amar continued providing trade secrets, knowledge, training and information, and tech support. This is in addition to trade secrets Manor has gained at Amar's business prior to The Agreement.

22. The profits of the new businesses will be divided 50/50. This is on top of the 50/50 Amar will receive for job referrals he makes to the partnership companies (Manor). For the partnership share it was expected that Amar will receive a weekly payment. such payments per week was expected to be around $1,000 per week approximately.

23. Manor (and the new businesses) will accept locksmith referral jobs from Amar and perform them with priority over all other jobs and over other locksmith referrals. (This section was very important to Amar because in the industry performance of referrals is a bottleneck for any automotive locksmith business, and it is difficult to find technicians who would perform jobs quickly and reliably. When no one can perform, job overflow is created, and this damages the business.)

24. As per the agreement, Manor (and the new businesses) accepted that Amar's locksmith jobs have priority before any other "referral company job". That is, Manor is committed to Amar to perform these jobs before jobs referred by any other referral company. This was a material issue for Amar. It was one of the main purposes of Amar getting into this agreement and providing all he provided.

25. All profits between referral company jobs would be split 50/50 between Amar and the new business.

26. The new businesses intended to build a network of technicians in the bay area for the purpose of being readily available to perform the referral jobs promptly.

27. Manor (as well as Defendant 2 and 3 or anybody on his behalf) is not allowed to open a locksmith company, nor advertise for locksmith services, in San Francisco CA and in San Jose, CA. Manor is not allowed to do this directly or indirectly. So not even via people on

his behalf. Manor is allowed to open locksmith business and/or advertise only in the east bay and peninsula or anywhere else in the country, but not in San Francisco or San Jose.

28. The parties did a handshake on this verbal agreement & there were several witnesses to this agreement.

29. Manor represented the Defendants 2 and 3. Furthermore, all the other defendants including 2,3,4 as well as 5-8 are individuals or corporations that were Manor's agents, or acting on his behalf, while the real interest was of Manor and/or Amar. That is except what is mentioned above regarding Yosef's share from Manor's share in the company Joe & The Lock (Defendant 6).

## The Breach

30. The Breach: Once the partnership was agreed upon the business started flourishing. Amar referred many clients to Manor. However, after Manor had been fully trained, and he was done learning and taking from Amar, and after the new business was fully set-up and running, Manor breached the agreement. Manor stopped accepting referrals, made the two first companies (formed close to the time of The Agreement, in December 2017 and January 2018), his own without sharing anything with Amar. In addition, Manor had opened two new companies (Defendant 7 and Defendant 8), which he registered in San Francisco and which were in direct competition with Amar, and which are a direct and material breach of the agreement.

31. Manor opened those two companies under the name of himself and under the name of Defendant 4 (Aharon Weintraub who is the brother of Yosef Weintraub). According to the Secretary of State, both companies were registered on Jan 10, 2019. Their names and their registered directors and incorporators were: One of the companies was named KING KEY LOCKSMITH SAN FRANCISCO INC. (Defendant 7), in which the incorporator and director is Menahem Shalit (that is, Manor).

32. The other company was named LOCKSTAR LOCKSMITH SAN FRANCISCO INC. (Defendant 8), in which the company's CEO, CFO, Secretary and also signed as "Owner" is Aharon Weintraub (Defendant 5) who is Yosef Weintraub's brother.

33. Not only were the opening of these two companies and running them was a material breach of The Agreement, but it was also a breach of the trademark Amar owns. Namely, "Auto Locksmith San Francisco". This is a "likelihood of confusion".

34. The likelihood of confusion is even stronger because Amar owns another trademark "Auto Locksmith San Jose". His trademark is strong, and consumers identify it.

35. The name Defendant chose was intentional to create a likelihood of confusion with the purpose of taking advantage of Amar's reputation, and Amar's investments in advertising this name and in creating good reviews to it. The name Defendants chose confuses consumers and clients to believe this is Amar's business, so defendants unlawfully and unfairly used Amar's reputation to unjustly enrich themselves. They unlawfully benefited on his account.

36. It's simply a false description or representation.

37. The name they chose has similarity in appearance, sound, and meaning.

38. They used the marketing channels Amar created and they started advertising in the very same marketing channels (mainly Google).

39. The product is the same product. That is, auto locksmith. Not only it's the same product "locksmith" but in fact what Defendants 1 and 4 , together with Defendants 7 and 8 did was the exact same service (niche in locksmith) , exact same geographic location (the city of San Francisco), exact same consumers, and exact same channels of advertising. On top of all, they used exact same techniques, know how, trade secrets, etc. What else would make this more unfair?

According to case law Century 21 Real Estate Corp. v. Sandlin, 846 F. 2d 1175 - Court of Appeals, 9th Circuit 1988:

   "The test for determining likelihood of confusion, as articulated in J.B.

 Williams, 523 F.2d at 191, requires consideration of six factors:

1) the strength or weakness of the marks;

2) similarity in appearance, sound, and meaning;

3) the class of goods in question;

4) the marketing channels;

5) evidence of actual confusion; and

6) evidence of the intention of defendant in selecting and using the alleged infringing name."

40. All of the above exist here.

41. On information and belief Defendant 8 which is registered under Aharon, is actually controlled and managed by Manor. The interest in the company is Manor's. This is despite the fact that to the outside world the company is presented as if owned by Aharon, probably the shares are officially owned by Aharon and any public information about it is on Aharon's name only.

42. Manor has registered these two companies on Google Ads and acquired verification from Google. This is as if they are two separate businesses in San Francisco. However, they are all Manor. Important to note that Google does not allow multiple business names in the same industry owned by the same person in the same area unless they are different businesses with different ownership. That's because business owners try to cheat Google (and the public) to in fact benefit from double the amount of Google search. However, using Aharon, Manor bypassed this and not only he misleads Google and the public, and not only he breached The Agreement, but he also created a double competition in the city of San Francisco.

43. Manor started to advertise his own two new companies (Defendants 7-8), in the San Francisco geographical area.  (this was forbidden according to the agreement). Therefore, not only did he start working alone but turned into Amar's fiercest competitor. Manor gained all his vocational knowledge about automotive locksmithing unjustly from Amar and further learned advertising techniques from Amar such as, but not limited to: What software tools and what laptop to buy, customer call training, strategies in opening and managing Google and Yelp accounts, how to fix reviews, marketing strategies such as what's allowed what's not allowed in the possibilities of opening more than one company in order to boost advertising, and other similar trade secrets.

44. Manor did not make the payments to Amar as agreed of the 50% of the profit arising out of the ownership, but he did pay in the beginning, according to the agreement the 50% of the referrals and did give the priority at the beginning as agreed regarding referrals from Amar. Amar didn't complain about this breach at the time because the main and most important component for him was to have the referrals performed. That is, to have an efficient operative arm that prevented dissatisfied clientele in cases of client overflow. One of the reasons this was important to Amar is because when customers call and there are not enough technicians to perform, it is a bad review for the business and it's a lost customer. Another reason is that the referrals generate about 50% income right there, before expenses or other splits.

45. However, commencing March 2019 Manor unilaterally announced to Amar that he will no longer accept the referrals nor give them the priority as agreed. In hindsight, it was revealed that Manor did this after he opened the two new companies and started to promote them and he planned to get 100% of each job.

46. Manor also made sure to perform, in the beginning, the side agreement he had with the broker of the Agreement, named Idan. That side agreement was that the Manor managed companies (mainly here, Defendant 5 and 6) will direct all the jobs coming in from San Francisco county to Idan. Idan is a mutual friend of Amar and Manor who also has a locksmith business. These referrals from Manor which were with no charge were in return for Idan that brokered the deal which is The Agreement. However, Manor started breaching this part as well.

47. On information and belief Manor has a pattern of betraying businesses partners and/or betraying people he worked with. Manor worked for Nir Philo, as a dispatcher in the regular locksmith business, not automotive locksmith. Manor later took the referral companies, which are the most important part of this business, and Manor opened a competition based on trade secrets he gained at Nir's business. Nir made it clear to Manor that this is unlawful and thus Manor relocated to San Diego. To note that Nir Philo used to be in the past an employee of Amar's business, and therefore Manor came to Amar in or around 2017 and

asked for help in arranging his coming back to the Bay Area despite Nir Philo's demands from him. Amar did help Manor with this, as he had a relationship and influence with Nir Philo. This was part of the consideration Amar gave Manor as part of The Agreement. However, besides the fact that it was part of the consideration, this is brought here to show that Manor had a pattern of unlawful and unfaithful competition, using trade secrets of his former employers or partners.

48. More on the pattern of Manor is, on information and belief, Manor, while working in Texas, approximately in 2013 and 2014-2015 respectively, stole a company from his friend and stole money from the business of another. Their names are Assi and Bar Cohen.

49. Another fact that shows Manor's pattern is that he breached the agreement with Idan.

50. More on the pattern of cheating by Manor, of cheating the system and taking advantage of those who help him, is the fact, as Amar declares he knows from Manor himself, and on information and belief, that Manor made the fake marriage with his friend Yosef Weintraub, for the purpose of acquiring a Green Card unlawfully. This is cheating and abusing the system because it hurts the gay community, because it does not allow the people who are truly gay, and really need the help of the system, to get Green Cards.

51. Amar contends that the above pattern of cheating the system and taking advantage of the efforts of the system to help, will be shown in trial as to two other defendants as well. Namely, Yosef Weintraub as well as separately with Shachar Barbie.  Yosef is taking part in this cheating.   On information and belief Shachar Barbie also made a fake green card marriage herself. In addition, she is Manor's girlfriend while she is aware of Manor's and Yosef's unlawful status and intentions.

52. In addition to the above,  Manor and the other defendants did the following: (To distinguish between Amar's company (Les) and the new partnership companies, the latter will be called "Manor Companies" and as mentioned above, when referring to "Manor" it sometimes refers to his agents as well, and the people and companies who worked for him, some of which are the other defendants in this case):

53. Manor stole and took over all the locksmith referral companies without Amar's consent.

54. Manor did not split the profit shares as agreed upon in The Agreement.

55. Amar's dispatch office was in a different country & when Amar and Manor worked together before the breach, Amar allowed Manor (and the two new corporations) to use it since they were partners (This can also serve as a proof because this office isn't allowed to work with other locksmiths in this area).

56. After Amar gave Manor priority to all jobs going to them first, & all the common business' technicians were working for Manor, after Manor stole the referral companies, he called Amar's office and said he's not accepting jobs from Amar's office anymore without any notice. (Breaching the promise of putting Amar's locksmith company jobs before other referral jobs). Manor did all of this without talking to Amar and without preparing Amar to organize other technicians. This was in spite of the reliance on Manor, because everything was relying on him. This breach by Manor severely damaged Amar's business and cost him a loss of many hundreds of thousands of Dollars. This amount will be proven at trial.

57. On information and belief, Manor's sales at the time were around $50k per month on average.

58. Manor took the shares and profits of the referral companies and technicians, and never gave Amar his half of 50%.

59. There is a concern that Manor has sold the common company or gave it in some other fraudulent way to someone else without consulting with Amar.

60. As to this section it is requested that the court will issue an injunctive relief to avoid doing any transactions as well as to close these companies and their businesses.

61. As mentioned, Amar and Manor (the broad Manor) had an agreement that Manor (and people or companies on his behalf) were not allowed to open a locksmith business in San Jose or San Francisco. So, Manor also breached this agreement by opening a locksmith business in San Francisco, and he even opened two of them, and worse, he opened them while using Amar's business name and trademark name.

62. All defendants (Manor the broad term) unlawfully used the trade secrets of Amar. The damage to Amar due to Manor not accepting and giving priority to referrals is that Amar's business could not take a higher load. Also, not being able to benefit from 50% +25% =75% of the revenue from referrals. Referrals are jobs that do not need your own technician to work on, and still generate revenue. In addition one of the main purposes of this part of The Agreement, and why Amar provided all he did, is that he wanted not only a prompt service for his callers but also it's more beneficial to refer to a business that he is a partner in.  Also, as a result of this breach emergency calls (jobs) could not be served promptly, if at all, and as a result those callers gave bad reviews on Amar's business. It will be shown in trial that before the breach by Manor, there were excellent reviews on Yelp and other websites, but after the breach, there were some bad reviews. The damage to Amar from this section only is estimated at about $800,000.

63. Just to emphasize that when a job is referred to a third-party business, who is not a partner, the job is not carried out immediately. This hurts the reputation of the business. It can also cause loss of the job altogether because then the caller cannot wait, and he or she calls another automotive locksmith.  Another relevant fact is that Manor's (All Manor's related people, which are all the other defendants) experience was not in automotive locksmith. Manor himself had some experience as dispatcher in a regular locksmith business (houses, doors) but not automotive locksmith. The latter requires special knowledge, special training, know-how, and trade secrets. All of which were provided by Amar.

64. According to The Agreement, Amar was entitled to be a partner in Defendant 5 and Defendant 6, (DAWN & THE LOCK INC and JOE & THE LOCK, INC.). That is in spite of the fact that his name was not on them. However, regarding the other two companies, Defendants 7 and Defendant 8, (KING KEY LOCKSMITH SAN FRANCISCO, INC. and LOCKSTAR LOCKSMITH SAN FRANCISCO, INC.), these companies were created and registered as a breach of The Agreement, and it was kept in secret by Manor and his people, until Amar discovered this fact. As mentioned, this was not only a breach of The

Agreement, but also a breach of the trade make, and stealing the trade secrets, and company secrets.

65. Part of the trade secrets and training Amar gave to Manor is how to operate and automotive locksmith business, trade secrets of special techniques of advertising in this area. For example, Amar taught Manor how to get certified by the account of Google, yelp, etc.  or to fix the review. Manor also learned from Amar how to get more advertisements from drivers who search on Google. Those businesses (Defendants 5-8), are still active and unlawfully taking business from Amar. As a result, the damages continue.

66. Amar can show continuous texting and instructions with Manor, before and after The Agreement, and during the operation of the new businesses (Defendants 5-6). Amar  would not have been  texting so much with Manor, and give him continuous assistance and cover, had he not been his partner.

67. Manor (and the other defendants) unlawfully and while breaching The Agreement, used the trade secrets from Amar for their benefit.

68. On top of all breaches, all Defendants, unlawfully benefited from unjust enrichment, and they also used business secrets and trade secrets in contrast to the purpose in which these business and trade secrets were given to them.

69. More examples of business secrets in this case include: (the list is not conclusive) Which software to work with, which tools, which laptop to work with, list of providers, which software providers are better than others and in what,  where to advertise, techniques of how to advertise, how to manage Google and its certificate or verification, what they do, how to create reviews, how to manage them, names of referral companies, names of technician, how to recruit technicians, which agreement to make with them, how to answer phone calls etc. etc. The fact that Amar did not enforce the weekly payments he is entitled to as partner, does not mean he gave up on them and does not mean he gave up his right for the equity. it was only cash flow on account that he did not enforce on time.

70. One other type of damage to Amar is that during all the time The Agreement was not breached, Amar relied on the fact that he has the technicians managed by Manor to perform.

But when Manor surprisingly and secretly opened the new companies (Defendants 7 and 8) in January 2019, and then about two month later also stopped providing the service for the referrals, Amar was stuck. No technicians and in fact all technicians who worked for him now work for a direct competitor. It takes time to recruit and train technicians.

71. In addition, the clients see that Amar cannot provide the service promptly and swiftly, and thus Amar's business reputation is hurt. This is in addition to the loss of revenue from those jobs.

72. The verifications by Google have a lot of value. This is also something Manor took from Amar, and instead of sharing it with Amar, and servicing Amar's jobs, they are actually used against Amar. These are additional damages. All of that while breaching The Agreement and while committing other unlawful actions by Manor and the other Defendants.

73. Additional breach of The Agreement by Defendants is that the new businesses, Manor (and all the people on his behalf) promised not only to not open a business of this type in San Francisco and San Jose but they also promised to positively mention in their advertisements that they do not give service in those two specific areas. (Referrals to Idan would be only if randomly a call order comes from San Francisco in spite of that). When Manor and his people breached, they started mentioning and adding in the companies' web presence, and in the ads (including Defendants 5 and 6) that they do give service in San Francisco. This is a breach by itself, which caused additional damage to Plaintiffs.

74. The fraud committed by Manor and the other defendants is also because they opened the two additional companies (Defendants 7 and 8) secretly, with the intention to defraud, and while knowing Amar is relying on the promised they made.

75. As mentioned, all the facts described in the two letters, Exhibits E and F, are an integral part of this complaint. Therefore, when Defendants answer this verified complaint, they have to admit or deny each and every section of these two letters.

1

**IN GENERAL FOR ALL CAUSES OF ACTIONS**

2   76. In each of all the following causes of action, Plaintiff incorporates by reference all the

3        allegations set forth above, including in the attachments to this Verified Complaint, if any,

4        as if set forth within the paragraphs of the causes of action in full.

5   77. As such, in each of the following cases of action, Plaintiff repeats and realleges the

6        allegations set forth above as if fully set forth herein in each of them.

7        78.     All Causes of Action are against all Defendants. All Defendants were acting

8        as agents and on behalf of the other Defendants and were acting as representatives of the

9        other Defendants and vice versa. Also, the Defendants 2-8 were used by Manor as his long

10       arm. Therefore, all Defendants are liable for all the actions, jointly and severally. That is

11       based on several reasons, some of which they acted for the others and because of vicarious

12       lability, and the principal - agent liability. Each of the following causes of action is against

13       all Defendants.

14           **FIRST CAUSE OF ACTION**

15             **(Breach of Contract)**

16   79. Plaintiff and Defendants entered into a contract;

17   80. Plaintiff did all, or substantially all, of the significant things that the contract required it to

18        do; or that Plaintiff was excused from having to;

19   81. All conditions required by the contract have occurred for Defendants performance,

20   82. Defendants failed to perform the contract.

21   83. Defendants acted in contrary to the contract.

22   84. Plaintiff was harmed and had suffered damages as a result of Defendants breach; and

23   85. Defendants' breach of contract was a substantial factor in causing Plaintiff's harm.

24   ///

25           **SECOND CAUSE OF ACTION**

26             **(Fraud)**

27   86. Defendants made a misrepresentation.

28   87. They had the knowledge of the falsity; they intended to defraud and to induce reliance;

88. Plaintiff relied upon the misrepresentation and as a result, a damage was caused to Plaintiffs and to LOCKSMITH EMERGENCY SOLUTIONS's executives and employees.

### THIRD CAUSE OF ACTION

### (Unjust Enrichment)

89. Plaintiff has given the Defendants something of value

90. Plaintiff expected compensation

91. The Defendants have acknowledged or benefited from the services or funds provided by the plaintiff.

92. The benefit of the Defendants was on account of the Plaintiff. Benefiting on account of Plaintiff, without paying for it, has not been done according to any legal right.

### FOURTH CAUSE OF ACTION

### (Negligence)

93. The Defendants had a legal duty to conform to a standard of conduct to protect the Plaintiff,

94. the Defendants failed to meet this standard of conduct,

95. the Defendant's failure was the proximate or legal cause of the resulting injury and damage, and

96. the Plaintiff, its executives, agents, and employees, were damaged.

*///*

### FIFTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

97. In every contract or agreement, and in any business relationship, there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

98. The parties had entered into agreements;

99. The Plaintiff did all the significant things that the contract required them to do, or that it was excused from having to do those things.

100.      All conditions required for Defendant's performance had occurred or were excused.

101.     However, Defendants unfairly interfered with Plaintiff's right to receive the benefits of the contract; and

102.     Plaintiff as well as its executives, agents, and employees were harmed by Defendants' conduct.

103.     The exact damages are subject to proof and determination in the trial.

104.     Furthermore, Defendants' breach was done with malice and oppression as they were committing fraud in breaching the implied covenant of good faith and fair dealing, and they intended to harm Amar for their own benefit and enrichment.

/////

### SIXTH CAUSE OF ACTION

**(False Promise)**

105.     Plaintiff claims it was harmed because Defendants made a false promise.

106.     Defendants made a promise to plaintiff;

107.     Defendants did not intend to perform this promise when they made it;

108.     Defendants intended that Plaintiff rely on this promise;

109.     Plaintiff reasonably relied on Defendants' promise;

110.     Defendant did not perform the promised act;

111.     Plaintiff was harmed; and

112.     Plaintiff's reliance on Defendants' promise was a substantial factor in causing its harm

### SEVENTH CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress)**

113.     Defendants fully intended to cause Plaintiff severe emotional distress.

114.     There actions and mis action exceed all bounds of decent behavior.

115.     The emotional state of Mr. Amar, and employees of Plaintiff, and other facts, including the damage, will be shown in trial.

**EIGHT CAUSE OF ACTION**

**(Trademark Infringement, and Unfair Competition)**

116.    This section is in fact seven different counts:

117.    **Federal** trademark infringement, 15 U.S.C. § 1114;

118.    **Federal** unfair competition, 15 U.S.C. § 1125(a);

119.    California statutory trademark infringement, Cal.Bus. & Prof.Code § 14340;

120.    Dilution, Cal.Bus. & Prof.Code § 14330;

121.    Unfair competition, Cal.Bus. & Prof.Code § 17200 et seq.; and

122.    California common law trademark infringement and dilution.

The facts in this case are suitable to the definitions described in the case law: Century 21 Real Estate Corp. v. Sandlin, 846 F. 2d 1175 - Court of Appeals, 9th Circuit 1988, as the Court of Appeals summarized:

"15 U.S.C. § 1114(1)(a). Neither actual confusion nor intent is necessary to a finding of *likelihood* of confusion

"Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), provides a cause of action for anyone injured by unfair competition:

> (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services ... any false description or representation, including words or other symbols tending falsely to describe or represent the same ... shall be liable to a civil action by ... any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

> " The test for determining likelihood of confusion, as articulated in J.B.

 Williams, 523 F.2d at 191, requires consideration of six factors:

1) the strength or weakness of the marks;

2) similarity in appearance, sound, and meaning;

3) the class of goods in question;

4) the marketing channels;

5) evidence of actual confusion; and

6) evidence of the intention of defendant in selecting and using the alleged infringing name."

All factors listed above exist in this case.

It's important to note that Manor and Aharon , as well as Defendant 7 and 8 (whether using Aharon as front or using Manor as front) chose the words "Locksmith San Francisco" intentionally, in order to confuse the consumers to believe it's Amar's business, called "Auto Locksmith San Francisco". The defendants had the intention in selecting and using the alleged infringing name.

More quotes from the above case law by the Court of Appeals, which applies here as well:

> "California's antidilution statute does not require a showing of likelihood of confusion. Levi Strauss, 778 F.2d at 1362; Cal.Bus. & Prof.Code § 14330 (West 1984). All that need be shown is the "likelihood of injury to business reputation or of dilution of the distinctive quality of a mark." Id. § 14330. Actual injury need not be proven. We agree with the district court that use of "Century Investments & Realty" in the real estate brokerage context could dilute Century 21's distinctive mark."

As above, the test applies here. There is the ""likelihood of injury to business reputation or of dilution of the distinctive quality of a mark."

As a result of Defendants actions, Amar's business suffered, and still suffers continuously.

////

## NINTH CAUSE OF ACTION

### (Trade secret misappropriation / Infringement)

123.    Plaintiffs owned trade secrets that gave them business advantage.

124.    The information at issue qualifies as a trade secret. It is secret information that confers a competitive advantage and was the subject of reasonable efforts to maintain its secrecy.

125.    The Defendants improperly acquired the information and or improperly disclosed it.

126.    In addition, the defendants acted willfully or maliciously.

## TENTH CAUSE OF ACTION

### (Inducing Breach of Contract/ Interference with Contractual Relations)

127.    Plaintiffs' claims that Defendant Aharon and Defendants 7-8, intentionally caused Manor and the other Defendants (1-3, 5-6) to breach their contract with Plaintiffs 1-2 (Amar).

128.    There was a contract between Amar and the other defendants. The corporations, Defendants 5-6 were bound by that contract as well.

129.    Aharon and Defendants 7-8 knew of the contract;

130.    Aharon and Defendants 7-8 intended to cause Defendants (1-3, 5-6) to breach the contract;

131.    Aharon and Defendants 7-8 's conduct caused Defendants (1-3, 5-6) to breach the contract;

132.    Plaintiffs 1-2 were harmed; and

133.    Aharon and Defendants 7-8's conduct was a substantial factor in causing Plaintiffs' harm.

////

## PRAYER FOR RELIEF

134.    WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

### ON ALL CAUSES OF ACTIONS:

135.    Determining that Amar (Plaintiffs 1 and 2) own 50% of the companies Defendants 5 and 6.

136.    Ordering Defendants to transfer 50% of the shares in those two corporations (Defendatns 5 and 6) in favor of Plaintiffs 1 and 2.

137.    Judgment ordering Defendants 1,2,3, and 5,6, to pay Plaintiffs 50% of all their profits since their inception in the business of automotive locksmith. In case the companies distributed the profits and or do not have enough money to pay those profits because those

profits were taken out by any of the Defendants then those defendants would return the money for the purpose of paying those amounts to Amar.

138.     Injunctive relief against all Defendants, and in particular all defendants' corporations (Defendants 5 -8) to cease from advertising and providing services of automotive locksmith in the city of San Francisco and the city of San Jose.

139.     Injunctive relief against all Defendants, (Defendants 1-8) with an order that prevents them from further disclosure or use of the trade secrets. This would be both in general and at least for the specific geographic areas of the San Francisco Bay.

140.     For a judgment against all Defendants to pay to Plaintiffs all profits they have made since January 2018 in the geographic areas of the city of San Francisco and the city of San Jose.

141.     In particular, ordering Defendants 7 and 8 to pay Plaintiffs 100% of their profit since inception.

142.     Injunctive relief against all defendants to stop using the name "Auto Locksmith San Francisco" and or any other name which confuses the public or causes the public to believe this is the "Auto Locksmith San Francisco" business, owned by Amar.

143.     Judgment, due to trade secrete misappropriation, for monetary damages, which are intended to compensate for economic injuries that are suffered by Plaintiffs because of the misappropriation. These damages are to assist Plaintiffs to recover for their own losses, as well as any profits made by the persons and corporations that misappropriated the secrets.

144.      For judgment in favor of Plaintiffs and against Defendants, and each of them, for compensatory damages, exceeding $800,000, and all other remedies otherwise provided by law, against Defendants under all the Causes of Action;

145.     Defendants conduct was intentional, wanton, willful, and outrageous, meriting the award of **punitive damages against Defendants** under all Causes of Action;

146.     Prejudgment interest, as authorized by law;

147.     All other remedies allowed by law for Federal trademark infringement, 15 U.S.C. § 1114; Federal unfair competition, 15 U.S.C. § 1125(a); California statutory trademark

infringement, Cal.Bus. & Prof.Code § 14340; Dilution, Cal.Bus. & Prof.Code § 14330; Unfair competition, Cal.Bus. & Prof.Code § 17200 et seq.; and California common law trademark infringement and dilution.

148.    For Plaintiffs' costs of litigation, including reasonable attorneys' fees and interest; and

149.    For such other and further relief as the Court may deem just and proper.

Respectfully submitted

Dated: February 28, 2020                    HADAR WEITZMAN LAW CORPORATION



By:    _____/s/_____

Hadar W. Weitzman


By HADAR W. WEITZMAN, Attorney for Plaintiff

LOCKSMITH EMERGENCY SOLUTIONS INC., a

California Corporation; and for MORDECHAY (MARK)

AMAR


VERIFICATION OF THIS COMPLAINT IS PROVIDED ON NEXT PAGE

**VERIFICATION**

1    I, MORDECHAY AMAR, am the Chief Executive Director (CEO) for Plaintiff
2   LOCKSMITH EMERGENCY SOLUTIONS INC. in the above-entitled action, (LOCKSMITH
3   EMERGENCY SOLUTIONS Inc AND MORDECHAY (MARK) AMAR v. MENAHEM
4   SHALIT (Aka MANOR SHALIT); YOSEF WEINTRAUB; SHACHAR BARBIE (Aka DAWN
5   BARBIE; Aka SHOSH BARBIE); AHARON WEINTRAUB ; DAWN & THE LOCK INC;
6   JOE & THE LOCK, INC.;  KING KEY LOCKSMITH SAN FRANCISCO, INC.;  LOCKSTAR
7   LOCKSMITH SAN FRANCISCO, INC., and DOES 1-10), and am authorized to execute this
8   verification on its behalf. I have read the foregoing complaint, and know the contents thereof.
9   The same is true of my own knowledge, except as to those matters which are therein alleged on
10  information and belief, and as to those matters, I believe it to be true.
11       I declare under penalty of perjury under the laws of the State of California that the
12  foregoing is true and correct.
13       Executed this _28_ day of February 2020, in San Jose, California.

_____

MORDECHAY (MARK) AMAR

STACK: 4,

VERIFIED COMPLAINT- BY LOCKSMITH EMERGENCY SOLUTIONS INC. V. Manor Shalit et al          **Page 26 of 26**